## SADOWSKI v. GENERAL DISCOUNT CORPORATION.

Civ. A. No. 2683.

United States District Court
E. D. Michigan, S. D.

Nov. 12, 1948.

Waldo C. Granse and Schmalzriedt, Frye, Granse & Frye, all of Detroit, Mich. (Miller, Canfield, Paddock & Stone, of Detroit, Mich., of counsel), for plaintiff.

Guy G. Bratton and Bratton & Bratton, all of Detroit, Mich. (Fred G. Dewey, of Detroit, Mich., of counsel), for defendant.

LEVIN, District Judge.

This action is brought to reform a written contract and for an accounting based upon the contract as reformed. The juris-

diction of the court is asserted upon the diversity of citizenship of the parties and the statutory amount involved.

In February, 1936, the defendant secured a license under Title II of the National Housing Act, 12 U.S.C.A. § 1707 et seq., permitting it to act as a mortgagee under that Act. Mortgages made in accordance with the provisions of Title II were insured for the full amount of principal and interest by the Federal Housing Administration (F.H.A.) In the subsequent month, it employed the plaintiff, Sadowski, to obtain applications for mortgages and to supervise its advertising. After the mortgages were closed, they were sold by other employees of the defendant. Sadowski had secured applications for mortgages in an amount of approximately $1,800,000, but the defendant found difficulty in disposing of the mortgages; of this sum less than half was processed and sold by October 16, 1936, the effective date of the contract which is the subject matter of this suit. The defendant was criticized by the Federal Housing Administration for not having procured outlets for the sale of the mortgages prior to forwarding the applications of proposed mortgagors to the F. H. A. for approval, and it was embarrassed by claims and threatened suits of applicants for failure to close the mortgages.

Altogether, the F. H. A. department of the business of the defendant had a very unprofitable experience until the contract was entered into. The unhappy predicament of the defendant was given formal recognition at three meetings of its board of directors. The directors expressed the desire to take steps without delay to sell the mortgage loan business, and the defendant during this period offered to accept $6,000 therefor. The president and vice-president and general counsel of the defendant were entrusted by the board of directors with the negotiations with the plaintiff to take over this department of the business. After such negotiations, a contract was entered into between the parties on October 31, 1936, but effective as of October 16, 1936. It was drafted and prepared for signature by the vice-president and general counsel of the defendant.

The F. H. A. mortgages were written for long terms of years and carried a maximum interest rate of 5%. They provided for the payment by the mortgagors of monthly installments which included principal, interest, mortgage insurance premiums, taxes, insurance and an item of servicing fees. There was a private market for the sale of these mortgages such as banks, insurance and trust companies, and a public market consisting of two agencies created by the Government of the United States, the Reconstruction Finance Corporation (R.F.C.) which had an existence beginning for some years previous to the period with which we are here concerned, and the Federal National Mortgage Association (F.N.M.A.) brought into being by the National Housing Act, 12 U.S.C.A. § 1716 et seq.

In connection with the creation, processing and servicing of the mortgages, a licensed mortgagee was permitted by the F. H. A. to collect non-recurring charges to the mortgagor for the processing of the application and the mortgage. A monthly servicing fee not exceeding 1/2% of the unpaid balances remaining from time to time was also charged to the mortgagor on mortgages made on applications taken prior to February 3, 1938. On mortgage applications received after that date, the mortgagor, by the provisions of an amendment to the National Housing Act was relieved of the payment of the monthly mortgage servicing fee. The servicing of a mortgage consisted of the collection of the monthly installments, making the required disbursements and remitting the portions of the payments which the owner of the mortgage was entitled to receive.

Sales of mortgages to private purchasers were made at a premium of approximately 2 1/2% to 3 1/2% against which a broker's commission and other expenses were charged, making a net premium to the mortgagee on the sale of about 1%. Private purchasers of the mortgages usually retained the licensed mortgagee to service the mortgages, such purchasers allowing 1/2% fee for such servicing, which fee, prior to February 3, 1938, was the 1/2% paid by the mortgagor.

Sales to R. F. C. on applications for mortgages taken prior to February 3, 1938,

were made at a discount of ½%, and the licensed mortgagee became obligated to pay a sum equal to this discount upon the agreement of R. F. C. to purchase even though delivery was made at a much later time. Such sales were usually accompanied by a servicing contract, entered into between the licensed mortgagee and the R. F. C., subject to cancellation by R. F. C. on 30 days' notice, which provided for a service fee of ½% on monthly balances to be retained by the licensed mortgagee out of the monthly payments due this agency, which, of course, reduced the interest return accordingly. This service fee was in addition to the monthly ½% charged to the mortgagor, and was a source of profit which compensated for the discount paid to the R. F. C.

On applications taken after February 3, 1938, when no service fee could be charged to the mortgagor, both government agencies purchased the mortgages at par, but the servicing contract accompanying such sales allowed ¾% as a service fee. The servicing contracts since that date were subject to cancellation by the government agencies after expiration of five years on 30 days' notice.

I now examine the contract entered into between the plaintiff and defendant, and the operations which flowed from it. After a recital that defendant "is desirous of remaining in said mortgage loan business only to the extent as provided for herein," the contract contains provisions, the pertinent features of which may be summarized as follows:

Plaintiff was granted the exclusive right for a period of two years from the date of the contract, unless terminated prior thereto in the manner therein provided, to complete and sell F. H. A. mortgages then owned by the defendant, and to obtain applications for additional F. H. A. mortgages, and to process and sell them through the defendant as licensed mortgagee.

The defendant was required to execute servicing agreements, "when requested to do so by" plaintiff. He was to receive and retain the processing fees for the applications and the mortgages, and agreed to repay defendant all expenses it had incurred on pending applications as the mortgages were consummated; and also agreed to pay to the defendant fees for each mortgage application, in accordance with designated classifications, in an aggregate amount of not less than $750.00 during each month, with the right reserved to the defendant to cancel the contract upon 30 days' notice in case the plaintiff during any three months' period did not produce fees averaging at least $1,500. per month for any such period. He deposited $2,500. in cash and a promissory note for $4,250. with the defendant, to secure his obligation under the contract.

The contract also provided, among other things, that the plaintiff should bear all expenses of operation, including the payment of rent to the defendant for office space. The plaintiff established his office on the premises of the defendant, paying the rent agreed upon, and a number of the defendant's employees were transferred to the offices of the plaintiff and employed by him. Subsequently, he moved his offices to another floor of the building, enlarged the number of his employees and increased his overhead, with the result that his monthly expenses amounted to between $3,500. and $4,500.

The responsibility of the defendant under the contract consisted of signing the required mortgage papers as processed and presented to it by the plaintiff, and executing the servicing contracts, when requested to do so by the plaintiff. It maintained a revolving fund at its bank and disbursed the mortgage monies and, of course, as a licensed mortgagee it serviced the mortgages in accordance with the terms of the servicing contracts. Its compensation consisted of the fees paid to it by the plaintiff on each mortgage, as provided for in the contract, servicing fees, and other profits incident to the operation of a mortgage business, such as late charges on mortgage payments, and commissions from the writing of fire and other insurance. In the two years following the effective date of the contract, the plaintiff procured upwards of 1300 mortgages, aggregating approximately $6,000,000. There is no dispute concerning the plaintiff's compliance with the terms of the contract.

The plaintiff by the contract was also to participate in the monthly servicing fees as set out in paragraph seventh. This is the paragraph in the contract which he asks to be reformed. It reads as follows:

"In the event of sale of mortgages in which the allowance for servicing charges is in excess of one-half of one per cent, the first party (defendant) shall pay such excess to second party (plaintiff) monthly."

There being no servicing fees in excess of ½% on servicing contracts entered into with private purchasers, we are here concerned only with the excess servicing fees allowed by government agency purchasers, these being: ½ of the total servicing fees of 1% on mortgages created on applications prior to February 3, 1938; ⅓ of the total servicing fees of ¾% on mortgages created on applications received subsequent to February 3, 1938.

The contract terminated, as therein provided, on October 16, 1938. The defendant takes the position that the period of two years set forth in paragraph first of the contract, controlled the payment of the service fees in excess of ½% as provided in paragraph seventh. The plaintiff submits that it was the true intention and agreement of the parties that he was to receive the service fees during the life of the mortgages processed by him, and as long as such excess service fees were collected by the defendant. This court is asked to reform the contract accordingly by decree and to determine the amount of money now owing to the plaintiff under the contract as reformed.

The plaintiff is confronted with the affirmative defenses of election of remedies, res adjudicata and estoppel, by reason of an adjudication in an action at law on the contract for the same damages claimed here, originating in the Circuit Court for the County of Wayne, Michigan, and thereafter appealed to the Supreme Court of Michigan, which resulted in a judgment for the defendant.

Without entering into a detailed discussion of the legal consequences of these affirmative defenses, it is sufficient to say that if the issues determined by the courts of Michigan, or the issues which could have been determined there on the case presented, were the same as are presented here, this court will not entertain the cause.

In order to discover the issues which were actually determined in the courts of Michigan, this court turns to the opinion of the supreme court of that state, entitled, Sadowski v. General Discount Corp., 295 Mich. 340, 342, 294 N.W. 703, 704. It was there stated:

"Plaintiff contends the contract compensation for excess service fees continued as a matter of law under section 7, and if it be held otherwise then that section is ambiguous and parol testimony of the understanding of plaintiff and expressions to like effect by officers of defendant company commanded a holding that it be so construed.

"Section 7, read in connection with the rest of the contract, is not ambiguous and the definite contract period of two years controls the rights of the parties and, in the absence of fraud or mistake, excludes prior, contemporaneous and subsequent talks as to its scope and purport."

It is clear, therefore,

(1) That the issue presented by the plaintiff in the state court was (a) that he was entitled to recover as a matter of law under paragraph seventh of the contract as written, and (b) that if the court held otherwise, then the section was ambiguous and he could introduce parol testimony of the real understanding of the parties.

(2) That the supreme court held first, that paragraph seventh was not ambiguous, and second, that in the absence of fraud or mistake, the parol testimony offered by the plaintiff to explain its meaning was not admissible.

In the light of such a holding by the court of last resort in Michigan, may the plaintiff institute an action in this court for the reformation of the contract to express what he claims to be its intended meaning?

It is obvious from the language of the state court that its decision was based upon the literal meaning of the words used in paragraph seventh of the contract. There can be no doubt that the cause of action presented to the state court was entirely different than the cause of action presented to this court. The action in the state

court was one at law on the contract as written. The parol testimony proffered by the plaintiff was for the purpose of explaining the words of paragraph seventh as written, and not for the purpose of establishing a mistake in the choice of the language used to express the real intention of the parties. The action in this court is to reform the contract so that it will, in fact, express that intention.

In Michigan it is provided by statute that "legal and equitable causes of action shall not be joined * * *" Compiled Laws ,1929, Sec. 13962, Stats.Ann.Sec. 27.591, and on the law side of the court no consideration of reformation of a contract is permissible. Scott v. Grow, 301 Mich. 226, 240, 3 N.W.2d 254, 141 A.L.R. 819. It is the position of the defendant, however, that by virtue of another statute, Compiled Laws 1929, Sec. 14008, Mich.Stat.Ann. 27.652, permitting the transfer of actions from the law side of the court to the equity side, the plaintiff is now foreclosed from maintaining the equitable action for reformation. This statute reads as follows:

"If at any time it appear that a suit commenced in equity should have been brought as an action on the law side of the court, or if it appear that an action commenced on the law side of the court should have been brought in equity, it shall be forthwith transferred to the proper side, and be there proceeded with, with only such alteration in the pleadings as shall be essential."

The Supreme Court of Michigan held that the contract set forth in the declaration was not ambiguous, and that the plaintiff could not recover on it as a matter of law. Would it, therefore, have been appropriate and would it have been of any benefit for the plaintiff to have sought a transfer from the law side of the court to the equity side? The transfer of the state court case from the law side to the equity side would have availed the plaintiff nothing because the case as brought sought damages on the contract as written, and did not seek reformation. As written, the plaintiff could not have recovered under the contract on either side of the court. In order for him to recover, reformation of the contract was essential. It is clear that the statute intended to deal only with cases

wherein a transfer from one side of the court to another did not essentially change the cause of action but merely made possible an adjudication of the asserted cause of action by the appropriate side of the court. See Lake Superior Brass Foundry Co. v. Houghton Circuit Judge, 209 Mich. 380, 176 N.W. 409.

Having reached the conclusion that there is no statutory bar to the plaintiff's action in this court, it must now be determined whether his action is barred by some other principle of law. The answer of the authorities is in the negative. In Bush v. Merriman, 87 Mich. 260, 49 N.W. 567, after pointing out that the distinction between law and equity as applied to remedies has been maintained in that state and that the jurisdiction to reform written agreements is vested exclusively in courts of equity, the court held that a judgment recovered by the defendant in a prior action at law for breach of the covenants of title in a deed executed by the plaintiff, did not bar the plaintiff from bringing an action in equity to reform the deed and enjoin the collection of the judgment.

In Nash v. Morrell, 171 Mich. 658, 137 N.W. 516, an action in equity was instituted to reform a note and chattel mortgage, and to foreclose the chattel mortgage. The complainant was met with the defense that the issue was concluded by a certain judgment in favor of the defendant, rendered by a justice of the peace in a replevin action brought by the complainant to recover the property. Testimony was introduced by the complainant before the justice of the peace concerning the claimed mistakes, omissions and alterations in the chattel mortgage and the note which it secured. The Supreme Court of Michigan stated, however, that the action in the justice's court was not conclusive of the question raised in the subsequent case to reform the chattel mortgage; that the only material fact in the justice's court to be established by the complainant in order to recover in replevin was her right to the possession of the property at the time the suit was brought; that such an action was one at law in which her claim depended upon the contents of the note and chattel mortgage

offered in evidence. The court said, 171 Mich. at page 661, 137 N.W. at page 517:

"It appears in the instant case that the claim of complainant is of a purely equitable character, which could not have been considered or determined by a court at law. She seeks by this suit to reform and correct mistakes made in the two instruments and to foreclose the chattel mortgage. It goes without saying that no such relief could have been granted by the justice court. It follows that the judgment of the justice court is not res adjudicata in the instant case. Upon this proposition, as far as we have been able to discover from the authorities, in cases where claims or defenses which are of a purely equitable character, and therefore not properly cognizable at law, a judgment at law cannot be pleaded as res adjudicata in a suit in equity instituted to establish equitable rights." See also Scott v. Grow, supra.

In Northern Assurance Company v. Grand View Bldg. Ass'n, 203 U.S. 106, 27 S.Ct. 27, 51 L.Ed. 109, the court considered a case in which a bill was filed to reform an insurance policy and to recover upon it as reformed. In a previous action at law upon the policy as written, it was held that the plaintiff could not recover, and that adjudication was offered in defense to the bill to reform. The Supreme Court of the United States, speaking through Mr. Justice Holmes, held that the former decision, 183 U.S. 308, 22 S.Ct. 133, 46 L.Ed. 213, was not an adjudication that the contract could not be reformed; that it was "rendered in an action at law, and only decided that the contract could not be recovered upon as it stood, or be helped out by any doctrine of the common law."

But one more authority need be cited, that of the United States Court of Appeals for this Circuit. Leithauser v. Hartford Fire Ins. Co., 124 F.2d 117, was a suit in equity for reformation of and recovery upon a fire insurance policy upon which the court had denied recovery in an action at law. The defenses raised in that case were the same as the defenses presented here, but the court held, after citing Northern Assurance Company v. Grand View Bldg. Assn., supra, that the judgment in the first Leithauser suit, 6 Cir., 78 F.2d 320, was not conclusive of the second; that while "the parties were the same in each case, the causes of action were not." [124 F.2d 121].

█ Having determined that the plaintiff is entitled to be heard in this court, it must now be considered whether he has sustained the burden which the law places upon him to establish his case.

As stated earlier, the president of the defendant company and its vice-president and general counsel were authorized by its board of directors to negotiate the contract with the plaintiff. The former is ·a business man, enjoying the high regard of the community, and the latter, who drafted the contract, is now the senior member of a distinguished law firm. The court has had the benefit of the personal appearance and the testimony of all of those who were identified with the defendant at the time of the negotiations leading to the execution of the contract, except that of one director, a transcript of whose testimony given in the state court was received in evidence by agreement of counsel. The court was most favorably impressed with the testimony of the plaintiff, the president, and the vice-president and general counsel of the defendant, all of whom testified in the most emphatic and direct manner that it was never contemplated, either by the plaintiff or the defendant, that the defendant would be relieved of paying the service fees required to be paid by it to the plaintiff under paragraph seventh, at the end of the period named in paragraph first, and that it was the intention of the defendant that paragraph seventh should read to give effect to the claim of the plaintiff.

Without intending in any way to assail the integrity of the witnesses for the defendant, it may be said that their testimony was largely to the effect that they did not remember the statements made by the plaintiff's witnesses as to what actually took place. The overwhelming evidence of the witnesses in favor of the plaintiff's claim is sufficient to justify the granting of the relief asked for, and an examination of the practical results of the operation of the business under the contract fortifies the claim of the plaintiff.

The cost of processing a mortgage in the experience of the defendant before the execution of the contract was greatly in excess of the closing and processing fees received. After the contract was entered into, having regard to the money payable to the defendant under the contract, the plaintiff was left with but a small profit on sales to private purchasers, and because of the payment of the discount on the sale of every mortgage sold to a government agency, he would suffer a loss on each mortgage processed and sold by him.

It took approximately six weeks to process a mortgage, and to receive the first installment payable by the mortgagor, so that the mortgage application received during the first month of the operation under the contract could not possibly and, in fact, did not result in excess servicing fees payable to the plaintiff until approximately December 1, 1936, and the defendant paid no excess service fees to him on mortgages processed after September 1, 1938, because such fees had been collected after October 16, 1938, the date of the termination of the contract.

It was the plaintiff who produced the excess servicing fees on all mortgages processed by him because he had control of the sale of the mortgages and could sell to private purchasers at a premium, with no resulting excess service fees, or to government agencies at a discount which would make available excess service fees for him. He closed 195 mortgages, aggregating $975,000 during September and the succeeding months of 1938, and in the first two months of 1939. Many of such mortgages, because of their sales to government agencies, pursuant to commitments entered into prior to February 3, 1938, were subject to the payment by the plaintiff of an amount equal to the ½% discount. It is unreasonable to assume that he would voluntarily enter into commitments to sell these mortgages at an inevitable loss.

The plaintiff has sustained the burden of proof required by him not merely by a preponderance of the evidence but by such weight of the evidence as leaves no reasonable doubt that it was the mutual intention of the parties that the plaintiff should receive the service fees in excess of ½% for the life of each mortgage, or during the existence of the respective servicing contracts.

The contract will, therefore, be reformed as prayed for by the plaintiff. An order consistent with this opinion and providing for an accounting may be presented for signature.